**In re RIODIZIO, INC., Debtor.**

**Bankruptcy No. 96 B 44429 (SMB).**

United States Bankruptcy Court,
S.D. New York.

Jan. 28, 1997.

Shustak Jalil & Heller, New York City, for Debtor; Erwin J. Shustak, of counsel.

Law Offices of Burton S. Weston, Manhasset, NY, for Riodizio Company, L.L.C.; Burton S. Weston, of counsel.

## MEMORANDUM DECISION REGARDING MOTION TO REJECT EXECUTORY CONTRACTS

STUART M. BERNSTEIN, Bankruptcy Judge.

Riodizio, Inc. (the "debtor") seeks, *inter alia,* to reject a stock option agreement and a shareholders agreement, both entered into in June, 1995. Riodizio Company, LLC ("LLC"), the optionee as well as a party to the shareholders agreement, opposes the motion. The motion thrusts us into the "psychedelic" world of executory contracts, Jay Lawrence Westbrook, *A Functional Analysis of Executory Contracts,* 74 Minn.L.Rev. 227, 228 (1989) ("Westbrook"), and reinforces the prophecy that the time that litigants and

the courts spend searching for "executoriness" can be put to better use analyzing the benefits and burdens of the contract itself.

For the reasons discussed below, the Court concludes that the stock option is an executory contract, and grants the debtor's motion to reject it. While the Court concludes that the shareholders agreement is also executory, the debtor has thus far failed to show the net benefit of its proposed rejection, but will have the opportunity to do so at an evidentiary hearing.

### FACTS

The debtor commenced this chapter 11 case on August 19, 1996. It owns and operates a Brazilian grill restaurant (called a "Riodizio" in Brazil) at 417 Lafayette Street in New York, New York. Prior to commencing business, the debtor and its two shareholders, Alan Berfas and Frank Ferraro, entered into numerous agreements with LLC to secure financing and equipment for the restaurant. These included a Loan and Lease Agreement, dated June 1, 1995 (the "Loan and Lease"), a Shareholders Agreement, dated June 23, 1995 (the "Shareholders Agreement"), and an undated stock option (the "Warrant") that the debtor granted to the LLC.

### 1. The Loan and Lease

Under the Loan and Lease, LLC advanced $200.000.00 to the debtor to operate the business. The terms of the loan, as evidenced by a promissory note, called for 15% interest, with principal and interest payable in 42 monthly installments. As security for the advances, the debtor gave LLC a priority security interest in all office equipment including, without limitation, computer equipment, kitchen equipment, fixtures, mailing lists, bank accounts, Transmedia agreements and proceeds, and accounts receivable. Berfas and Ferraro also provided a limited guaranty by depositing into escrow, in favor of LLC, their respective shares in the debtor, general stock powers, and their resignations as officers, directors and employees.

The Loan and Lease also provided that LLC would purchase and then lease kitchen

and other equipment valued at $150,000.00 to the debtor. Previously, however, the Court denied the debtor's motion to reject this equipment lease. First, the equipment lease was not a true lease, but rather, a security financing arrangement involving a self-amortizing loan under which the debtor paid the entire purchase price, including interest, in forty-two monthly installments of $4,612.36 each. Second, the equipment lease was part of the single Loan and Lease agreement, and the debtor could not "cherry pick" and reject unfavorable provisions contained in an integrated agreement.

### 2. The Warrant and Shareholders Agreement

As part of the underlying transaction, the debtor also executed the Warrant.[1] It states, in its entirety, as follows:

> Riodizio, Inc. (the "Corporation") hereby grants to the holder of this warrant the right to purchase all or part of an aggregate of 93 common shares of the Corporation for the consideration of one dollar ($1.00) per share.

> This warrant may be exercised for a period of twenty fuve [sic] years.

The Warrant was signed on behalf of the debtor by Berfas and Ferraro, each of whom own 33 shares of the debtor's common stock. If LLC exercises its warrant (and the debtor delivers the shares), LLC will own approximately 60% of the debtor's outstanding shares based upon an additional investment of only $93.00.

Finally, the debtor, Berfas, Ferraro and LLC entered into the Shareholders Agreement. According to the introductory "WHEREAS" clauses, they did so at LLC's request "as an additional safeguard to its collateral." Further, LLC is made a party "solely for the purpose of granting the Company the legal and equitable right to sue for the enforcement of the agreement and/or seek damages for the breach of this Agreement; and to protect the value of the war-

rants." The Shareholders Agreement protects LLC's financial stake in the debtor, or otherwise benefits it, in several ways. First, it requires Berfas and Ferraro to establish a four person board of directors which will include two LLC nominees in addition to themselves. Second, it requires a two-thirds shareholders vote to take certain "extraordinary" actions. If LLC exercises its warrants and controls nearly 60% of the outstanding stock, it will be able to veto these "extraordinary" actions.[2] Third, if the shareholders open a different type of restaurant, they must first offer LLC the right to participate in the venture.

The balance of the Shareholders Agreement concerns rights and obligations running between the debtor and the shareholders. For example, Berfas and Ferraro cannot open a similarly-styled restaurant within ten miles of any restaurant operated by the debtor unless the debtor gives its written consent. Under those circumstances where they can operate a similarly-styled restaurant, they must first offer the debtor the right to participate in the venture. The debtor must purchase Key Man Life Insurance on the lives of the individual shareholders. Finally, the Shareholders Agreement contains a series of provisions relating to the sale or transfer of the shares, giving the non-selling shareholder and/or the debtor a right of first refusal.

### DISCUSSION

### 1. Introduction

Section 365(a) states that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The Bankruptcy Code does not define the term "executory contract." The legislative history regarding this section states that "[t]hough there is no precise definition of what contracts are executory, it generally includes contracts on which performance remains due to some extent on both sides."

---

1. Although the Warrant and Shareholders Agreement were executed in connection with the lending transaction, both parties treat them as separate, independent agreements for purposes of section 365.

2. Article 9.2 of the Loan and Lease grants LLC many of these same veto powers, and does not depend upon LLC becoming a shareholder.

H.R.Rep. No 95–595, at 347 (1977); S.Rep. No. 95–989, at 58 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5844, 6303; *Accord NLRB v. Bildisco and Bildisco,* 465 U.S. 513, 522 n. 6, 104 S.Ct. 1188, 1194 n. 6, 79 L.Ed.2d 482 (1984); *Eastern Air Lines, Inc. v. Insurance Co. of State of Pennsylvania (In re Ionosphere Clubs, Inc.),* 85 F.3d 992, 998–99 (2d Cir.1996). Finding this definition too broad and sweeping, *see Mitchell v. Streets (In re Streets & Beard Farm Partnership),* 882 F.2d 233, 235 (7th Cir.1989) (taken literally, the legislative history definition would render "almost all agreements executory since it the rare agreement that does not involve unperformed obligations on either side"); *In re Spectrum Info. Tech., Inc.,* 190 B.R. 741, 746 (Bankr.E.D.N.Y.1996) ("'[t]he problem with the ... definition is if it is to be stretched, it becomes evident that all contracts could be considered executory'") (quoting *In re Bluman,* 125 B.R. 359, 361 (Bankr.E.D.N.Y.1991)), most courts have adopted Professor Countryman's definition of an executory contract as

> a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other.

Vern Countryman, *Executory Contracts in Bankruptcy: Part 1,* 57 Minn.L.Rev. 439, 460 (1973). *Accord Enterprise Energy Corp. v. United States (In re Columbia Gas Sys., Inc.),* 50 F.3d 233, 239 (3d Cir.1995); *Cameron v. Pfaff Plumbing & Heating, Inc.,* 966 F.2d 414, 416 (8th Cir.1992); *In re Streets & Beard Farm Partnership,* 882 F.2d at 235; *Pacific Express, Inc. v. Teknekron Infoswitch Corp. (In re Pacific Express, Inc.),* 780 F.2d 1482, 1487 (9th Cir.1986); *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.),* 756 F.2d 1043, 1045 (4th Cir.1985), *cert. denied,* 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986); *In re Spectrum Info. Tech., Inc.,* 193 B.R. 400, 404 (Bankr. E.D.N.Y.1996); *In re 375 Park Ave. Assocs., Inc.,* 182 B.R. 690, 697 (Bankr.S.D.N.Y.1995); *In re Child World, Inc.,* 147 B.R. 847, 851 (Bankr.S.D.N.Y.1992); *In re Chateaugay Corp.,* 102 B.R. 335, 344–45 (Bankr.S.D.N.Y. 1989).

Under Countryman's "material breach" test, a prepetition contract is executory when both sides are still obligated to render substantial performance. *In re Columbia Gas Sys.,* 50 F.3d at 239; *In re Streets & Beard Farm Partnership,* 882 F.2d at 235; *In re 375 Park Ave. Assocs.,* 182 B.R. at 697. Where such performance remains due on only one side, the contract is non-executory, and hence, neither assumable nor rejectable. *See In re Chateaugay Corp.,* 102 B.R. at 345. The materiality of the breach is a question of state law. *In re Columbia Gas Sys., Inc.,* 50 F.3d at 240 n. 10. Thus, if applicable nonbankruptcy law permits either party to sue for breach because of the other party's failure to perform, the contract is executory. *See In re Streets & Beard Farm Partnership,* 882 F.2d at 235.

■ Ordinarily, executoriness is determined as of the petition date. *In re Columbia Gas Sys., Inc.,* 50 F.3d at 240; *In re Spectrum Info. Tech., Inc.,* 193 B.R. at 404. Sometimes, however, postpetition events alter the executoriness of a contract, as when a contract expires postpetition. In those circumstances, a court will look to the date the motion to assume or reject is made or heard rather than the petition date. *See In re Spectrum Info. Tech., Inc.,* 193 B.R. at 404; *In re Wang Lab., Inc.,* 154 B.R. 389, 391 (Bankr.D.Mass.1993); *In re Child World, Inc.,* 147 B.R. at 852; *Cohen v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.),* 138 B.R. 687, 700 (Bankr.S.D.N.Y.1992) *("Drexel").*

Some have found the Countryman "material breach" test too constraining and static. In *Chattanooga Memorial Park v. Still (In re Jolly),* 574 F.2d 349 (6th Cir.), *cert. denied,* 439 U.S. 929, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978), a pre-Code case, the Court observed:

> [The Countryman] definition[ ] [is] helpful, but do[es] not resolve th[e] problem. The key, it seems, to deciphering the meaning of the executory contract rejection provisions, is to work backward, proceeding from an examination of the purposes rejec-

tion is expected to accomplish. If those objectives have already been accomplished, or if they can't be accomplished through rejection, then the contract is not executory within the meaning of the Bankruptcy Act.

*Id.* at 351. *Accord In re Leibinger–Roberts, Inc.,* 105 B.R. 208, 211 (Bankr.E.D.N.Y.1989) (to determine whether an agreement is executory, one must consider the purposes of section 365 which permit the debtor to "escape onerous and burdensome contracts in which the obligations of the debtor far exceed any possible benefit to the estate.").[3]

In this same vein, some advocate a functional analysis which eliminates the requirement of executoriness. *See Westbrook, supra,* 74 Minn.L.Rev. 227; *see also* Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding Rejection,* 59 U.Colo. L.Rev. 845 (1988) ("Andrew I"); Michael T. Andrew, *Executory Contracts Revisited: A Reply to Professor Westbrook,* 62 U.Colo. L.Rev. 1 (1991) ("Andrew II"). Under the functional approach, "the question of whether a contract is executory is determined by the benefits that assumption or rejection would produce for the estate." *Sipes v. Atlantic Gulf Communities Corp. (In re General Dev. Corp.),* 84 F.3d 1364, 1375 (11th Cir.1996) (affirming on the basis of the district court's opinion, 177 B.R. 1000 (S.D.Fla.1995)); *accord Drexel,* 138 B.R. at 696 (synthesizing the Westbrook and Andrew articles, and concluding that a threshold requirement of executoriness is misplaced; rather, the proper analysis is whether rejection will produce a benefit to the estate).

The functional approach does not repudiate the Countryman rule; it merely recognizes its limitations. *In re G–N Partners,* 48 B.R. 462, 466 (Bankr.D.Minn.1985). It also conserves the time and effort that the parties and the court otherwise spend resolving the question of executoriness. But it has its critics. To be subject to assumption or rejection, the statute, 11 U.S.C. § 365, expressly requires that the contract be executory. Ignoring executoriness rewrites the statute in a fundamental way. *See In re Child World, Inc.* 147 B.R. at 851 ("Manifestly, th[e functional] approach ignores the statutory requirement that the contract to be assumed or rejected must be 'executory.' ").

## 2. The Warrant

█ Options agreements, such as the Warrant, demonstrate the shortcomings of the Countryman definition. "[A]n option contract is essentially an enforceable promise not to revoke an offer." *In re III Enterprises, Inc. V,* 163 B.R. 453, 460–61 (Bankr. E.D.Pa.), *aff'd,* 169 B.R. 551 (E.D.Pa.1994). It is a unilateral contract until exercised; upon exercise, it becomes a bilateral contract. W. Jaeger, *Williston on Contracts* § 61B (3d ed. 1963); John Calamari & Joseph M. Perillo, *The Law of Contracts* § 2–25, at 123 (3d ed. 1987) (an option contract is a hybrid; initially, it is an irrevocable offer, upon exercise, it becomes a bilateral contract); *see also Leslie Fay Cos. v. Corporate Property Assocs. 3 (In re Leslie Fay Cos.),* 166 B.R. 802, 810 (Bankr.S.D.N.Y.1994); *In re A.J. Lane & Co.,* 107 B.R. 435, 437 (Bankr.D.Mass.1989).

█ An option contemplates performance by both parties but requires it from only one. The optionor must keep the offer open. The optionee may but need not exercise the option; if he does, each party must perform its obligations under the resulting bilateral contract. The optionee's failure to exercise the option constitutes a failure of condition rather than a breach of duty. The failure to perform a condition which is not also a legal duty cannot give rise to a material breach, *In re Columbia Gas Sys. Inc.,* 50 F.3d at 241, *see Merritt Hill Vineyards Inc. v. Windy Heights Vineyard, Inc.,* 61 N.Y.2d 106, 112–13, 460 N.E.2d 1077, 1081–82, 472 N.Y.S.2d 592, 596–97 (1984), and hence, an option contract is not executory under the Countryman definition. Andrew II, *supra,*

---

**3.** *Leibinger* actually collapsed the executory and functional analyses, described in the succeeding text, into one test. The court stated:

When a debtor cannot reap any present or future benefits from a contract due to a change in circumstance, the contract's life as an executory contract comes to an end and the contract becomes unilateral and enforceable against the parties in the absence of a valid defense.

105 B.R. at 211.

62 U.Colo.L.Rev. at 32; *see, e.g., In re America West Airlines, Inc.*, 179 B.R. 893, 896 (Bankr.D.Ariz.1995) (stock option not executory because optionee has no continuing obligations); *Brown v. Snellen (In re Giesing)*, 96 B.R. 229, 232 (Bankr.W.D.Mo.1989) (by paying for the option, debtors-optionees fully performed their obligations under the option, and option could no longer be rejected); *Travelodge Int'l, Inc. v. Continental Properties, Inc. (In re Continental Properties, Inc.)*, 15 B.R. 732, 736 (Bankr.D.Haw.1981) (an option is an executed contract and not an executory contract).

Most courts, however, consider an option contract to be executory although they reach their conclusions through different routes. In *In re Waldron*, 36 B.R. 633 (Bankr. S.D.Fla.1984), *aff'd without op.*, (S.D.Fla.), *rev'd on other grounds*, 785 F.2d 936 (11th Cir.), *cert. dismissed*, 478 U.S. 1028, 106 S.Ct. 3343, 92 L.Ed.2d 763 (1986), the debtors granted a real estate option to the Shell Oil Company. The debtors subsequently filed a joint chapter 13 petition in order to reject the contract since the value of the property exceeded the option price.

The *Waldron* court held that the option was executory, but relied on the "some performance due" standard cited in the legislative history rather than the more rigorous Countryman test. Initially, the court noted that "performance continues to remain due on the part of the Debtors" because they had to keep their offer open. *In re Waldron*, 36 B.R. at 637. In addition, some performance also remained due from Shell. The court assumed, in light of the value of the real estate, that Shell would exercise the option. *Id.* To do so, Shell had to tender its acceptance in accordance with the terms of the option contract, and this "is the performance that foreseeably remains due by Shell or its assignees." *Id.* Further, once Shell exercised the option, "the option contract will immediately transform into an executory contract for the sale of real property." *Id.*

The court reached the same conclusion by an alternative route. Quoting a lengthy passage from *In re Booth*, 19 B.R. 53 (Bankr. D.Utah 1982), the court tacitly acknowledged the limitations of the Countryman test and presaged the functional analysis discussed above. It observed that executory contracts are not measured by the mutuality of commitments but the nature of the parties and the goals of reorganization. Thus, the benefit to the estate rather than the form of the contract controls. *In re Waldron*, 36 B.R. at 637.

The option cases that came after *Waldron*, but adopted the Countryman definition, faced a dilemma. The optionor's obligation—to keep the option open—was substantial, but the optionee did not owe any substantial obligation that could result in a material breach. Andrew II, *supra*, 62 U.Colo.L.Rev. at 32. To fit the option contract within the "material breach" test, they conflated the option contract with the contingent bilateral contract, finding the optionee's duty of substantial performance in the contingent obligation to perform under the bilateral contract created by the exercise of the option. *See, e.g., In re Coordinated Fin. Planning Corp.*, 65 B.R. 711, 713 (Bankr.9th Cir.1986); *In re Sundial Asphalt Co.*, 147 B.R. 72, 80 (E.D.N.Y.1992); *In re III Enters., Inc. V*, 163 B.R. at 468–69; *In re Parkwood Realty Corp.*, 157 B.R. 687, 690 (Bankr.W.D.Wash. 1993); *In re A.J. Lane & Co.*, 107 B.R. at 437; *In re Hardie*, 100 B.R. 284, 286–87 (Bankr.E.D.N.C.1989); *In re G–N Partners*, 48 B.R. at 465.

■ The case law confirms that executoriness lies in the eyes of the beholder. Despite the contrary case law discussed above, the Warrant, an option contract, is not an executory contract under Countryman's "material breach" test.[4] The debtor granted the

---

4. Although LLC also argues that the Warrant is not executory, its reasoning is wrong. LLC erroneously contends that the debtor's only duty under the Warrant is the "ministerial" task of delivering the shares to LLC if it exercises the option to purchase. The debtor must, however, keep the offer open, and under New York law, the failure to do so constitutes a material breach of the option agreement as well as the contingent bilateral contract. *Cf. Scholle v. Cuban–Venezuelan Oil Voting Trust*, 285 F.2d 318, 320 (2d Cir.1960) (stock optionor's anticipatory breach of its duty to deliver shares excused optionee's tender and entitled it to recover damages); *Special Situations Fund III, L.P. v. Versus Tech., Inc.*, —— A.D. ——, 642 N.Y.S.2d 894, 895 (1st Dep't)

option to LLC as additional consideration for the loan. LLC fully performed any legal obligation in connection with the Warrant when it funded the loan. While the exercise of the Warrant is a condition to the debtor's obligation to deliver the shares to LLC, LLC is not legally obligated to exercise the Warrant or do anything (or refrain from doing anything).

If the "some performance due" test in the legislative history is overly inclusive, the Countryman test excludes too much. It imposes a "material breach" requirement, raising the threshold of executoriness above what Congress seemed to intend.[5] In the case of options, it excludes contracts under which the debtor has benefits and burdens, each party must still perform as a condition to the other party's performance, and assumption or rejection may confer a net benefit on the estate. Under the circumstances, we should question the test rather than condemn the contract to a "legal limbo" in which it can be neither assumed nor rejected. See Westbrook, supra, 74 Minn.L.Rev. at 239.

■■■ A test less exclusive than Countryman's that takes into account the mutual performance requirement embodied in the legislative history should be substituted. Under this test, a contract is executory if each side must render performance, on account of an existing legal duty or to fulfill a condition, to obtain the benefit of the other party's performance. Weighing the relative benefits and burdens to the debtor is the essence of the decision to assume or reject; if each party must still give something to get something, the contract is executory, and the debtor must demonstrate whether assump-

tion or rejection confers a net benefit on the estate. If the debtor has done everything it needs to do to obtain the benefit of its bargain, assumption serves no purpose, and the debtor may simply sue to enforce its rights. Similarly, if the other party has done everything necessary to require the debtor to perform, the debtor's performance adds nothing to the estate, the debtor will not assume the contract, and the other party can file a prepetition claim.[6] Here, the Warrant is executory; each party must perform under the Warrant in order to obtain the benefits under the contingent bilateral contract of sale. To sell the shares and receive payment, the debtor must keep the offer open. To make payment and acquire the shares, LLC must first exercise the option granted under the Warrant.[7]

■■■ Having concluded that the Warrant is executory, the Court must determine whether its rejection will benefit the estate. Control Data Corp. v. Zelman (In re Minges), 602 F.2d 38, 41 (2d Cir.1979); see In re Columbia Gas Sys., Inc., 50 F.3d at 239 n. 8 (an appropriate rejection will benefit the creditors as a whole at the expense of the nondebtor party); In re G Survivor Corp., 171 B.R. 755, 758 (Bankr.S.D.N.Y.1994) (the court must only determine that rejection will likely benefit the estate), aff'd, 187 B.R. 111 (S.D.N.Y.1995). While a court will ordinarily defer to the business judgment of the debtor's management, In re Minges, 602 F.2d at 43, Berfas and Ferraro have an interest in preventing LLC from exercising the option and diluting their personal stakes in and control over the debtor.[8] Consequently, the

(same), leave to appeal denied, 88 N.Y.2d 815, 673 N.E.2d 1243, 651 N.Y.S.2d 16 (1996).

**5.** The Second Circuit has never expressly adopted the Countryman test, and in its most recent pronouncement, In re Ionosphere Clubs, Inc., 85 F.3d 992, it referred instead to the legislative history for the proper standard. Id. at 998–99.

**6.** The postpetition breach of a prepetition contract gives rise only to a prepetition claim. In re Episode USA, Inc., 202 B.R. 691, 696 (Bankr. S.D.N.Y.1996); In re Chateaugay Corp., 102 B.R. at 351.

**7.** If the Warrant is not executory, the debtor's effort to reject it is a superfluous act. See Drexel, 138 B.R. at 709 (quoting Andrew I, supra, 59 U.Colo.L.R. at 17). Thus, if LLC has fully performed under the Warrant, it is in no different position than the trade vendor who sold onions to the debtor prepetition, and never received payment; the seller has a damage claim, but must await a pro rata payment with the other unsecured creditors. Westbrook, supra, 74 Minn.L.Rev. at 269.

**8.** For example, the Shareholders Agreement requires a two-thirds vote of the shareholders to pay Berfas or Ferraro more than $35,000.00 annually. If LLC becomes a controlling share-

debtor cannot rely on the presumptions of business judgment rule to support its decision. *See In re Integrated Resources, Inc.,* 147 B.R. 650, 656 (S.D.N.Y.1992) (listing the elements necessary to apply the presumption of the business judgment rule), *appeal dismissed,* 3 F.3d 49 (2d Cir.1993).

 The Court's independent review nevertheless confirms that rejection benefits the estate without any significant downside. Proper business reasons for rejecting a contract include the following: (1) the contract is uneconomical to complete according to its terms, *In re RLR Celestial Homes, Inc.,* 108 B.R. 36, 43 (Bankr.S.D.N.Y.1989); (2) the contract is financially burdensome to the estate, *In re Minges,* 602 F.2d at 42; *In re Leibinger–Roberts, Inc.,* 105 B.R. at 211; (3) rejection will make the debtor more attractive to a prospective purchaser or investor, *In re G Survivor Corp.,* 171 B.R. at 759; (4) rejection will result in a large claim against the estate, *In re Sun City Inv., Inc.,* 89 B.R. 245, 249 (Bankr.M.D.Fla.1988); and (5) in the case of a stock option contract, the debtor can market the shares and receive a higher or better price than the option offers. *In re III Enters., Inc. V,* 163 B.R. at 469.[9]

The Warrant provides a *di minimis* benefit to the debtor, granting it the right to receive $93.00 if LLC exercises its option. On the other hand, it deprives the debtor of the possibility that it can sell the same shares for more money to another investor during the next twenty-three years of its remaining life. It does not matter whether this hypothetical investor exists; a $93.00 payment is so *de minimis* that the mere possibility outweighs any benefit in performing the Warrant.

 Breaching the Warrant through rejection produces a minimal, adverse effect on the estate. Rejection constitutes a breach of contract immediately prior to the petition date. 11 U.S.C. § 365(g)(1). At the outset, the Warrant does not create any property interest in LLC's favor that would survive rejection. *See Drexel,* 138 B.R. at 709 (rejection does not terminate rights in specific property created by the rejected contract) (quoting Andrew I, *supra,* 59 U.Colo.L.Rev. at 17). A breach leaves LLC with a claim for damages equal to the difference between the option price and the market value of the shares at the time of the breach. *Hermanowski v. Acton Corp.,* 729 F.2d 921, 922 (2d Cir.1984); *see Special Situations Fund III, L.P. v. Versus Tech., Inc.,* 642 N.Y.S.2d at 895 (aggrieved optionee entitled to recover lost profits). If LLC suffered any damage, this goes far to proving the wisdom of rejection; the debtor can sell the shares (to LLC or a third party) for more than the per share price of $1.00, and pay LLC's claim in tiny bankruptcy dollars.[10] Further, LLC's claim is arguably subordinated under 11 U.S.C. § 510(b) to the payment of its other unsecured creditors.

### 3. The Shareholders Agreement

 Consideration of the Shareholders Agreement is far more straight forward. Manifestly, it is executory. It subjects both the debtor and the shareholders to substantial obligations discussed above. For example, the shareholders cannot compete within ten miles, they must offer the debtor the chance to participate in any similarly-styled restaurant, and the debtor enjoys a right of first refusal if any shareholder decides to sell his shares. On the other hand, the debtor must maintain key man life insurance on the lives of the individual shareholders. In its

holder, it can veto any proposed salary increase that raises their annual salaries above that amount. Under the Loan and Lease, the shareholders require LLC's consent only if they seek to raise their annual salaries above $50,000.00

**9.** Some courts refer to a balancing of equities, suggesting that rejection should be refused if it will cause disproportionate harm to the nondebtor party. *In re Sundial Asphalt, Inc.* 147 B.R. at 82; *In re Midwest Polychem, Ltd.,* 61 B.R. 559, 562 (Bankr.N.D.Ill.1986). The right to as-

sume or reject an executory contract is designed to permit the debtor to shed its obligations under burdensome and uneconomical contracts. Section 365 *does not require any balancing of the equities.*

**10.** This assumes that the shares are at least as valuable today or in the future as they were on the petition date. But even if they are not, the option price is so low as to confer no meaningful benefit on the estate.

opposition papers, LLC does not take much issue with executoriness, focusing instead on the lack of any benefit accruing to the debtor from rejection.

The record is insufficient, however, to determine whether the debtor should be permitted to reject this contract. Having outlined only some of the relevant benefits and burdens of the Shareholders Agreement, the Court must leave it to the parties to quantify these rights and obligations, and provide an evidentiary basis to support the decision to reject. For instance, the parties have not revealed the cost of the insurance. It may represent a burdensome administrative expense. On the other hand, the existence of the restrictions on competition and the rights of first refusal may enhance the value of the debtor to a potential investor.

Not surprisingly, both parties instead focus their attention on the corporate governance issues rather than the debtor's rights and obligations. The debtor seems to assume that rejection will relieve the debtor of LLC's management control, and moreover, that this is good for the debtor.[11] Conversely, LLC argues that the debtor's management is incompetent, or worse, and the debtor is better off if LLC can impose limitations on management's control.

Neither argument merits consideration in the context of the present motion. In essence, each asks the Court to decide which managers and management limitations are best for the debtor. In the absence of "clear abuse," a bankruptcy court will not ordinarily interfere in corporate governance issues involving the debtor.[12] *Manville Corp. v. Equity Sec. Holders Comm. (In re Johns–Manville Corp.)*, 801 F.2d 60, 64 (2d Cir.1986); *In re Dark Horse Tavern*, 189 B.R. 576, 581 (Bankr.N.D.N.Y.1995). If LLC believes that current management is incompetent or dis-

honest, it can move for the appointment of an operating trustee. *See* 11 U.S.C. § 1104(a).

Finally, *In re Leibinger–Roberts, Inc.*, 105 B.R. 208 (Bankr.E.D.N.Y.1989), on which LLC relies, is distinguishable from the Shareholders Agreement in this case. There, Chief Judge Duberstein concluded that the shareholders' agreement at issue was not executory because the estate derived no benefit from either its assumption or rejection. *Id.* at 212–13. The case does not stand for the proposition that LLC seems intent to extract: a shareholders' agreement concerns the shareholders but not the corporate debtor. The only rule to draw is that it depends on the particular shareholder agreement. The Court has already noted that the Shareholders Agreement confers benefits on the debtor but at a price. *Leibinger* mandates the conclusion that the Shareholders Agreement is executory, and requires the further inquiry of benefits and burdens that underlies section 365.

## CONCLUSION

The Court grants the debtor's motion to reject the Warrant, and directs the parties to contact chambers to schedule an evidentiary hearing. The hearing will concern whether rejection of the Shareholders Agreement benefits the estate.

SETTLE ORDER ON NOTICE.

---

**11.** Rejection does not necessarily relieve the shareholders of their obligation to LLC to create a four person board and give two of those seats to LLC's nominees.

**12.** LLC states, without citation to any authority, that rejection provides no benefit because the debtor and its shareholders will be subject to the same restrictions under the New York Business Corporation Law. This statement is too sweeping, and therefore wrong. First, the

Shareholders Agreement is not limited to issues of corporate governance controlled by the Business Corporation Law. Second, the Business Corporation Law does not require the debtor to give LLC any management authority over the debtor's affairs, or require a supermajority shareholder vote to raise the shareholders' annual salaries above $35,000.00, or enter into contracts for more than $5,000.00.